

Entered on Docket
January 30, 2015
EDWARD J. EMMONS, CLERK
U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

The following constitutes
the order of the court. Signed January 29, 2015

Charles Novack
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>BHISHAM KUMAR SAINI AND NEENA SAINI,<br><br>Debtors. | Case No. 12-57801 CN<br><br>Chapter 7 |
| PARMINDER SINGH GILLON AND BHUPINDER GILLON,<br><br>Plaintiffs,<br><br>vs.<br><br>BHISHAM KUMAR SAINI AND NEENA SAINI,<br><br>Defendants. | Adversary No. 14-4151<br><br>MEMORANDUM DECISION |

On March 4, 2013, plaintiffs Neena Saini and Bhisham Kumar Saini (the "Sainis") commenced this adversary proceeding against defendants Parminder Singh Gillon and Bhupinder Gillon (the "Gillons") seeking a non-dischargeable judgment under Bankruptcy Code §§ 523(a)(2)(A), 523(a)(4)[1], and 523(a)(6), as well as the denial of the Sainis' chapter 7 discharge under Bankruptcy Code §727(a)(4). This court conducted a trial in this adversary proceeding on June 26, and 27, 2014 and July 14 and 21, 2014. This memorandum decision constitutes this court's

---

[1] Following trial, the Plaintiffs voluntarily dismissed their §523(a)(4) claim for relief.

1

findings of fact and conclusions of law under Fed. R. Bankr. P. 7052.

## I. The Gillons' Non-Dischargeability Claims

### PNS and The Washington State Court Litigation

The Sainis and the Gillons are indirectly related by marriage, and the two couples have known each other for more than twenty years. In June 2006, Neena Saini and Parminder Gillon formed PNS Properties, Inc. ("PNS"), a Washington state corporation. In October 2006, PNS acquired, among other things, a gas station, convenience store, car wash, bulk fuel sales operation and a warehouse in Kittitas County, Washington for $1.55 million (collectively, the "Gas Station"). PNS financed the acquisition through a $1.266 million bank loan and a $189,000 note in favor of the seller (the "Devere Note"). The Gillons and Sainis guaranteed both obligations. The Sainis had no experience running a gas station. Parminder Gillon, however, had substantial experience managing gas stations and related businesses, and he managed PNS' day-to-day operations from October 2006 through August 12, 2008.

The relationship between the Sainis and Gillons began deteriorating soon after PNS began operating the Gas Station. The ensuing disillusionment and distrust resulted in the Sainis suing the Gillons in Washington State Superior Court in August 2007, seeking damages for breach of contract, breach of fiduciary duty between shareholders, breach of directors' and officers' duty of good faith and loyalty, wrongful diversion of corporate assets and conversion (the "Washington State Court Litigation").

On August 12, 2008, the Gillons and Sainis entered into a memorandum of agreement (the "MOA") designed to streamline the Washington State Court Litigation. The MOA (which is discussed in greater detail below) provided that: (A) the Sainis would purchase the Gillons' interest in PNS, with the purchase price to be determined by a formula set forth in the MOA (the "Purchase Price"); (B) the Sainis would assume sole control of PNS; (C) the Gillons would deposit funds or obtain a bond to secure the Purchase Price during the pendency of the Washington State Court Litigation; and (d) the Sainis would refinance the bank loan to release the Gillons' guarantees.

The Gillons timely relinquished control of PNS and its business operations to the Sainis. The Sainis, however, did not timely tender the Purchase Price, and the Gillons filed a motion to

compel the Sainis' compliance with the MOA. On January 9, 2009, the Washington State court granted the Gillons' motion and directed the Sainis to deposit a $300,000 bond in the court's registry within 21 days. The Sainis failed to comply with this order, and the Gillons subsequently filed a breach of contract counterclaim (the "MOA Counterclaim") in which they sought damages or specific performance under the MOA.

The Sainis thereafter amended their Washington State Court Litigation complaint in March 2009 to include PNS as a co-plaintiff with identical claims against the Gillons (the "PNS Claims"). On April 24, 2009, the Washington State court granted partial summary judgment in the Gillons' favor and dismissed all of the Sainis' individual claims. The Washington State court then conducted a nine-day trial on the remaining claims. Following trial, the Washington State court entered findings of fact, conclusions of law and a judgment (the "Judgment")[2] which rejected the PNS Claims and awarded $344,824.92 in damages to the Gillons on the MOA Counterclaim. These damages purportedly represent the Purchase Price due the Gillons under the MOA. The Gillons allege herein that the Sainis' breach of the MOA is non-dischargeable under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(6).

The MOA is at the heart of the Gillons' § 523(a) claims for relief. As stated above, the MOA was designed to provide a mechanism to resolve the Washington State Court Litigation. The Gillons and the Sainis signed the MOA in August 2008, and the Gillons fully complied with their contractual obligations under it by turning over full control of PNS to the Sainis. In turn, the Sainis agreed, among other things, to purchase the Gillons' interest in PNS for an amount equal to the Gillons' investment in PNS and to refinance PNS' bank loans to remove the Gillons as guarantors.

The MOA was by no means well drafted by the parties' Washington State Court Litigation attorneys. Regardless, the MOA is, in form and function, a purchase agreement. In paragraphs 1 and 2, the Gillons and Sainis agreed to transfer "management and control" of PNS to Neena Saini as of 5:00 PM on August 12, 2008. After that date, Neena Saini was to be solely responsible for all

---

[2] The Sainis timely appealed the Judgment. On February 7, 2012, the Court of Appeals of the State of Washington, Division Three, affirmed the April 24, 2009 Summary Judgment Order as well as the Judgment.

3

liabilities incurred by PNS. The MOA also contains an indemnification clause, holding the Gillons harmless from any liabilities incurred by PNS after the transfer date. Paragraphs 4, 5 and 6 address the Purchase Price, the means for determining that amount, and how the Purchase Price would be held pending trial and thereafter disbursed. These paragraphs provide that:

> "4. Saini shall purchase Gillon's interest in PNS Properties, Inc. The purchase price shall be the total sum of all funds invested Gillon in PNS Properties, Inc. whether by capital contribution or loan, and Gillon shall provide the documentation necessary to confirm said amount. The purchase price shall be by agreement of the parties, by independent audit or by court order - and any amounts remaining in dispute shall remain a part of the litigation. [3]
>
> 5. Said funds shall be placed into an interest-bearing blocked account, pursuant to court order, and shall remain in said account until such time as the dispute between the parties giving rise to the [Washington State Court Litigation] shall be resolved through settlement, arbitration and/or mediation, or by trial on the merits; alternatively the Sainis may purchase/place bond into the court registry in the amount TBD.
>
> 6. In the event any funds are determined to be owed by Gillon to PNS Properties, Inc. and/or Saini arising from the allegations in said complaint, said funds shall be paid to PNS and/or Sainis from the purchase price funds being held in the blocked accounts before the balance, if any, is distributed to Gillon; however this paragraph does not act as a cap in any settlement amount or award that either party may be entitled through the litigation - see ¶ 7."

The Sainis devoted significant trial time arguing that (a) when they signed the MOA, they believed that Gillon had ineptly and fraudulently managed PNS causing them severe economic harm, (b) they were confident that they would prevail in the Washington State Court Litigation trial, and (c) the Washington State court would award them damages far in excess of the Purchase Price. The court does not doubt the depth of their conviction, and their dogged pursuit and appeal of the Washington State Court Litigation evidences this. Yet this belief does not excuse their failure to perform their MOA obligations, and, in fact, is damning evidence that they never intended to transfer funds into the blocked account or obtain a bond. The MOA states that the Purchase Price is to be offset only *after* the conclusion of Washington State Court Litigation. The Washington State Court, in fact, so held:

---

[3] Paragraph 10 of the MOA also directs the parties to execute a stock purchase agreement consistent with the MOA "as soon as practical." The Gillons and Sainis never executed a stock purchase agreement."

1) "Pursuant to the MOA, the Sainis are to purchase the Gillons' interest in PNS, with the purchase price being 'the total sum of all funds invested by Gillon in PNS....whether by capital contribution or loan'; with this sum to be reduced only by any funds determined to be owed by Mr. Gillon to PNS 'arising from the allegations contained in the complaint.'" Plaintiff's Exhibit 3, Sec. 1, Par. 51.

2) "Pursuant to the MOA, in exchange for Ms. Saini gaining sole control of PNS and its business, the Sainis are to purchase Gillons' entire interest in PNS, with the purchase price being determined as follows: Mr. Gillon is to receive the net balance of all money he contributed, directly or indirectly, to PNS, whether by capital contribution or loan. This initial purchase price is to be reduced only by any funds determined to be owed by Mr. Gillon to PNS arising from the allegations contained in the complaint." Plaintiff's Exhibit 3, Sec. II, Par. 12.

3) "The Parties never agreed that the purchase price would be reduced by PNS' accounts payable, or by its operating losses, unless these were the result of some proven wrongful conduct by Mr. Gillon . . . nor were PNS' interest expenses, asset amortization, or any other aspect of its operations to be taken into account." Plaintiff's Exhibit 3, Sec. 1, Par. 52.

4) Mr. Gillon would not have entered into the MOA . . . if the purchase price were to be offset by accounts payable and operating losses that occurred in 2008 that were not caused by any wrongful conduct by him . . ." Plaintiff's Exhibit 3, Sec. 1, Par. 54.

Accordingly, there is little doubt that the Sainis knew that their obligation to fund the Purchase Price by cash or bond was distinct from any offsets the Sainis or PNS possibly could assert. Regardless, the Sainis never intended to comply with the MOA's terms.

*First*, the Sainis knew when they signed the MOA that the Purchase Price would be a substantial sum. In January 2008, several months before signing the MOA, the Sainis retained a forensic accounting firm, Acuity Group LLP, to analyze PNS' finances. Acuity Group prepared several reports for the Sainis to determine what damages they could assert in the Washington State Court Litigation. Its analysis also examined Gillon's investment in PNS. The Sainis relied on these reports.

For example, in a report dated May 15, 2008, Acuity Group stated that Gillon's "equity balance" is $320,000, which included (I) an "unverified" cash contribution of $130,000 and (ii) the $189,265 Devere note. While this report pre-dated the MOA, Acuity Group appears to have employed the same basic formula found in the MOA for determining the Purchase Price. Thus, when the Sainis signed the MOA, they were on notice that the Purchase Price was a significant amount.

5

Acuity Group also issued a report several months after the MOA which identified $100,100 in cash deposits made by Gillon in August 2006 as his "initial contributions of capital" to PNS (Acuity Group then reduced this amount to $81,100 by offsetting certain "questionable" transactions), and credited Gillon with $219,000 paid to PNS from Gillon's personal accounts between February 2007 and April 2008, a $46,710 payment on the Devere Note, and $3,090 in PNS expenses charged to Gillon's personal credit card.

Curiously, the Sainis never asked Acuity Group to calculate the Purchase Price under the terms of the MOA. Instead, these numbers were part of Acuity Group's attempt to determine the Sainis' potential damages claim against PNS and/or the Gillons.[4] In fact, Acuity Group first learned of the MOA in May 2009 - nearly 10 months after its execution.

*Second*, despite realizing that the Purchase Price could be substantial, the Sainis made little if any effort to comply with the MOA's Purchase Price mandate. On September 3, 2008, three weeks after executing the MOA, the Gillons' attorney provided the Sainis' attorney with a written accounting that established a $411,622.13 Purchase Price and a request that the Sainis deposit this amount into a blocked account or obtain an equivalent bond. While the Sainis responded (by letter dated September 19, 2008) that their auditor (Acuity Group) would review the accounting and respond by mid-October, the Sainis never responded nor otherwise countered the Gillons' accounting and proposed Purchase Price. Of course, by this time the Sainis already had received Acuity Group's May 2008 "equity balance" analysis.

Having been stonewalled by the Sainis, the Gillons filed a motion to compel compliance with the MOA in December 2008. On Jan. 9, 2009, the Washington State court granted the motion to compel and ordered the Sainis to deposit a $300,000 bond within twenty-one days of its order. The Sainis did not comply with this order, and, on February 17, 2009, the Washington State Court held the Sainis in contempt and directed them to post the bond by March 1, 2009. The Sainis again failed to comply with the order. The evidence also suggested that the Sainis lacked the financial

---

[4] Acuity Group's analysis yielded three possible outcomes ranging from a net balance of $141,355 in favor of Gillon to a net balance of $1,427,419 owed by Gillon to PNS.

wherewithal to pay the Purchase Price or obtain a sufficient bond.

From the Sainis' perspective, these facts support only a breach of contract claim which they never believed would come to pass. The Sainis believe that they complied with the MOA. While the parties did not agree on a Purchase Price nor seek an independent audit, the Sainis argue that the parties exercised the MOA's third option, which was to obtain a court order establishing the amount. While this argument has some facial plausibility, it cannot withstand any degree of scrutiny. The evidence firmly establishes that the Sainis knowingly executed the MOA to obtain full control over PNS, and without any intent to fund the Purchase Price. The Gillons relied on the MOA's terms and complied with their obligations under it. Moreover, the Gillons had no reason to question the Sainis' intent to comply with the MOA or their ability to tender the Purchase Price. The Gillons knew that the Sainis had made substantial investments themselves in PNS, and that they owned several parcels of real property.

The Sainis' conduct damaged the Gillons. In the Judgment, the Washington State court found that in the Spring 2008, an individual named Gary Bain offered to purchase PNS for $1.57 million. The Gillons and the Sainis both agreed to the sale. Bain, however, failed to obtain sufficient financing, and Neena Saini refused to accept his lesser, subsequent offer.

Bain renewed his $1.57 million offer on August 19, 2008 - after the Parties executed the MOA and the Sainis assumed control of PNS. This time, Bain had the financing to close the sale. Regardless, the Sainis rejected his offer. PNS ultimately filed a Chapter 11 bankruptcy, and the Sainis and Gillons lost their entire investment in PNS.

Parminder Gillon testified that had he not signed the MOA (and retained managerial control of PNS) he would have sold PNS to Bain. He further testified that he would have received approximately 70% of his investment in PNS from this sale, an amount equal to $241,377.44. The Sainis did not offer any evidence that questioned this net recovery in a hypothetical sale, nor did they contend that they would or could have blocked any such sale if Parminder Gillon had retained control over PNS.

**Issue Preclusion and the §523(a) Claims**

Issue preclusion, also known as collateral estoppel, bars relitigation of an issue decided

7

previously in a judicial or administrative proceeding, provided that the losing party had a full and fair opportunity to litigate the issues in the earlier proceeding . *See, e.g.*, *Allen v. McCurry*, 449 U.S. 90, 96, (1980); *In re Elder*, 262 B.R. 799, 806 (C.D. Cal. 2001). In determining the issue-preclusive effect of a state court judgment, federal courts must, as a matter of full faith and credit, apply the forum state's law of issue preclusion. *In re Nourbakhsh*, 67 F.3d 798, 800 (9th Cir.1995); *see also*, *In re Bugna*, 33 F.3d 1054, 1057 ( 9th Cir. 1994). Issue preclusion applies in dischargeability proceedings. *Grogan v. Garner*, 498 U.S. 279, 284 (1991).

Much of the factual underpinnings of the Gillons'§523(a)(2)(A) claim were resolved in the Washington State Court Litigation. The Judgment contains extensive findings regarding the meaning and purpose of the MOA as well as the circumstances surrounding its execution and the Gillons' attempts to enforce its terms. This court's December 2, 2013 "Amended Order Denying Motion to Compel" found that the Judgment satisfied the State of Washington's issue preclusion standard,[5] requiring this court to recognize the preclusive effect of the Washington State Court's factual findings. Accordingly, this court has incorporated herein, to the extent necessary, the Washington State Court's findings of fact.

**The §523(a)(2)(A) Claim**

The Bankruptcy Code is designed to provide debtors with a "fresh start" which enables them to "reorder their affairs, make peace with their creditors and enjoy a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt." *In re Miller*, 310 B.R. 185, 193(Bankr. C.D. Cal. 2004). The benefits of the "fresh start" are limited, however, to the "honest but unfortunate debtor." *Grogan*, 498 U.S. at 287. This limitation is reflected, in part, by Bankruptcy Code §523(a), which "exclude[s] from the general policy of discharge certain categories of debts -- such as child support, alimony . . . as well as liabilities for

---

[5] Washington state courts apply issue preclusion when the following four elements are satisfied: (1) the issue decided in the prior litigation is identical with the issue now before the court, (2) there was a final judgment on the merits, (3) the party against whom an issue is now asserted is a party or in privity with a party to the prior litigation, and (4) the application of collateral estoppel will not work an injustice against the party against whom the doctrine is applied. *Hanson v. City of Snohomish*, 121 Wash.2d 552, 561, 852 P.2d 295 (1993).

fraud." *Grogan v. Garner*, 498 U.S. 279, 287 (1991). Under Bankruptcy Code § 523(a)(2)(A), debts arising from false pretenses, a false representation, or actual fraud are not discharged in Chapter 7 cases.

The term "actual fraud" in §523(a)(2)(A) refers to the general common law of torts. *Field v. Mans*, 516 U.S. 59 (1995). Thus, to prove a debt's nondischargeability due to actual fraud, a creditor must prove that: (1) the debtor made a representation; (2) the debtor knew the representation was false when he made it; (3) the debtor made the representation with the intention and purpose of deceiving a creditor; (4) the deceived creditor justifiably relied on the representation; and (5) the creditor sustained damage as the proximate result of the debtor's representations. *In re Eashai*, 87 F.3d 1082, 1086 (9th Cir. 1996); *In re Britton*, 950 F.2d 602, 604 (9th Cir. 1991). A creditor must prove each element by a preponderance of the evidence. *Grogan*, 498 U.S. at 288. To establish a non-dischargeable debt under § 523(a)(2)(A), the "target misrepresentation must have existed at the inception of the debt, and a creditor must prove that he or she relied on that misrepresentation. *In re Reingold*, 2013 WL 1136546, at *5 (9th Cir. B.A.P. March 19, 2013); *see also, In re Boyajian,* 367 B.R. 138, 147 (9th Cir. B.A.P. 2007) (*citing Bombardier Capital, Inc. v. Dobek (In re Dobek)*, 278 B.R. 496, 508 (Bankr. N.D. Ill.2002).

"Fraudulent intent may be established by circumstantial evidence, or by inferences drawn from a course of conduct." *In re Devers*, 759 F.2d 751, 753-54 (9th Cir. 1985). Intent to deceive may be inferred when a party fails to make initial, or preliminary steps to perform a contractual obligation. *Orsine v. Orsine*, 254 B.R. 184, 190 (Bankr. N.D. Ohio 2000). *See also In re Rubin*, 875 F.2d 755, 759 (9th Cir. 1989) ("[A] promise made with a positive intent not to perform or without a present intent to perform satisfies § 523(a)(2)(A)."); Intent to deceive may be inferred if a debtor takes no steps to perform under a contract. *In re Sharma*, 2013 Bankr. LEXIS 2286 (B.A.P. 9th Cir.May 14, 2013) (citing to *Merchs. Nat'l Bank & Trust Co. of Indianapolis v. Pappas (In re Pappas*), 661 F.2d 82, 86 (7th Cir. 1981); *In re Baljian*, 2014 Bankr. LEXIS 1419 (Bankr. S.D. Cal.Mar. 26, 2014); 4 Collier on Bankruptcy P.523.08[1][e], p.523-46 (16th ed. 2014). In determining whether the debtor had no intention to perform, a court may look to all the surrounding facts and circumstances. *In re Mereshian*, 200 B.R. 342, 347 (9th Cir. B.A.P. 1996). Intent to

9

deceive may be inferred from the totality of circumstances. *In re Eashai*, 87 F.3d 1082, 1087 (9th Cir. 1996) ("A court may infer the existence of the debtor's [deceptive] intent . . . if the facts and circumstances . . . present a picture of deceptive conduct by the debtor.").

The burden to prove "justifiable reliance" does not require a creditor to investigate a debtor's representations. See *Field v. Mans*, 516 at 70 ("[A] a person is justified in relying on a representation of fact although he might have ascertained the falsity of the representation had he made an investigation.")(*quoting* Restatement (Second) of Torts § 545A cmt. b (1976)). A creditor, cannot, however, blindly rely on the misrepresentation if the "slightest inspection" would have revealed the falsity of the misrepresentation. *Id*. The 9th Circuit has refined the Supreme Court's scope and limits on justifiable reliance, explaining that "although a person ordinarily has no duty to investigate the truth of a representation, a person cannot purport to rely on preposterous representations or close his eyes to avoid discovery of the truth." *In re Eashai*, 87 F.3d 1082, 1090-1091(9th Cir.1996). See also *In re Miller*, 310 B.R. 185, 198 (Bankr. C.D. Cal. 2004) ("justifiable reliance does not exist where a creditor ignores red flags."). The capacity to identify "red flags," however, turns on differences between individuals and the circumstances of the particular case. Thus, "[j]ustification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case." *In re Eashai*, 87 F.3d at 1090; *In re Sharma*, 2013 Bankr. LEXIS 2286 (B.A.P. 9th Cir. May 14, 2013) ("Justifiable reliance is a subjective standard that turns on a person's knowledge under the particular circumstances.").

Finally, to establish damages under §523(a)(2)(A) a plaintiff must establish that he suffered damages proximately resulting from the misrepresentation. *In re Kim*, 163 B.R. 157, 161 (9th Cir. BAP 1994) *See also, In re Siriani*, 967 F.2d 302 (9th Cir. 1992); *In re Pagnini*, 2012 WL 5489032, at *5 (9th Cir. B.A.P. November 13, 2012).

The Gillons have met their burden of proof regarding the elements of §523(a)(2)(A). As stated above, the Sainis made specific representations in the MOA regarding how they intended to determine and fund the Purchase Price. The Sainis, confident in their belief that they would prevail at trial, never intended to comply with the MOA's Purchase Price terms. This gamble constituted actual fraud, as the Gillons relied on the Sainis' representations and transferred unfettered control

10

over PNS to their extreme detriment. The Gillons therefore are entitled to a non-dischargeable, $241,377.44 judgment under Bankruptcy Code § 523(a)(2)(A).

**The § 523(a)(6) Claim**

The Gillons also seek a non-dischargeable judgment under Bankruptcy Code § 523(a)(6). This code section provides in pertinent part that a Chapter 7 debtor cannot discharge a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."

The "willful" and "malicious" prongs of § 523(a)(6) are analyzed separately. *In re Sicroff*, 401 F.3d 1101,1105 (9th Cir. 2005). The Ninth Circuit has held that an injury is 'willful' "when the debtor has a subjective motive to inflict [such] injury" or when the debtor believes that injury is "substantially certain to result from his own conduct.*" In re Su*, 290 F.3d 1140, 1142 (9th Cir. 2002). A bankruptcy court may consider circumstantial evidence to establish what the debtor must have known at the time of the conduct in question, rather than simply relying on what a debtor admits he knew. *Su*, at 1146, n. 6. A "malicious injury involves (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse." *In re Jercich*, 238 F.3d 1202, 1209 (9th Cir. 2001). Malice may be inferred based on the nature of the wrongful act*. In re Ornsby*, 591 F.3d 1199, 1207 (9th Cir. 2010). The Gillons must establish these elements by a preponderance of the evidence. *Grogan*, 498 U.S. at 291. This court has already determined that the Sainis executed the MOA without any intention of tendering either a cash amount or security bond representing the Purchase Price. While the MOA was a sale agreement, its unusual feature was that the sales price was to be fully escrowed pending the resolution of the Washington State Court Litigation. The Sainis contend that they had a good faith belief that they would prevail and their damages claims would more than offset the Purchase Price. Sincere as their belief may have been, they cannot escape the simple fact that the MOA explicitly contemplated a scenario where they did *not* prevail.

Under the MOA, the Gillons' only possibility of recouping their PNS investment was the Purchase Price. The Sainis knew that the Purchase Price could be substantial, and that if they did not deposit the Purchase Price amount or obtain a sufficient bond, the Gillons would recover little if anything if they prevailed at trial. The Sainis therefore acted "willfully." Their conduct was also

11

malicious. Their intentional failure to comply with the MOA was wrong, and it was done without any just cause or excuse. It also directly injured the Gillons, as they were left holding an empty judgment. Accordingly, the Gillons are awarded a non-dischargeable, $241,377.44 judgment under Bankruptcy Code § 523(a)(6).

**Interest on the §§ 523(a)(2) and (a)(6) Claims**

In their post-trial brief, the Gillons argue that they are entitled to statutory interest on the $344,824.92 judgment entered in their favor by the Washington State Court. According to the Gillons, statutory interest of 12% per annum has been accruing from April 24, 2009 (the date of entry of the Judgment) through the conclusion of trial in this adversary proceeding. The Gillons acknowledge in their post-trial briefing that this court may award actual damages in the amount $241,377.44 rather than the $344,824.92 award set forth in the Judgment, and request that the court award statutory interest on such damages award as well.

The Gillons do not provide this court with any legal basis to award such interest. From what the court can glean from their post-trial brief, the Gillons seem to believe that this court's judgment on the claims relating to the MOA is somehow an extension or affirmation of the Judgment entered by the Washington State Court. If this is their position, the Gillons are mistaken. The Judgment awarded the Gillons damages on a breach of contract claim and contained no findings that the Sainis had committed fraud or had willfully and maliciously injured them. While the Gillons did ask this court to honor certain of the findings in the Judgment under the doctrine of collateral estoppel (issue preclusion), the Gillons have never in the course of this litigation moved this court to hold that the findings in the Judgment concerning the MOA constituted claim preclusion. If that where the case, this matter would never have gone to trial. The Gillons cannot raise this issue for the first time post-trial. For all the above reasons, the Gillons request for statutory interest on the Judgment from the date of its entry is denied.

The Gillons have also requested that the court award pre-judgment interest on their §523 claims, with such interest accruing at the federal prejudgment interest rate from the date they filed this adversary proceeding through the entry of this court's judgment on the §523 claims. 28 U.S.C. §1961 provides for post-judgment interest on judgments entered in federal district court. Although

12

there is no statutory basis for pre-judgment interest, the Ninth Circuit has held that the pre-judgment interest rate on judgments entered in federal district court is equivalent to the interest rate prescribed for post-judgment interest under 28 U.S.C. § 1961. *Western Pacific Fisheries, Inc. v. S.S. President Grant*, 730 F.2d 1280, 1289 (9th Cir. 1984). The Ninth Circuit has also held that the federal pre-judgment interest rate applies to actions brought under federal statutes, including bankruptcy proceedings. *Banks v. Gill Distrib. Ctrs., Inc.*, 263 F.3d 862, 871 (9th Cir. 2001). Accordingly, the Gillon's are awarded interest on this court's award of damages on the §523 claims at the federal pre-judgment rate, with such interest having accrued from March 4, 2013, the date the Gillons filed this adversary proceeding, through the date of entry of this court's judgment on the §523(a) claims.

## II. The Gillons' Denial of Discharge Claims

### The India Property

On November 21, 1990, Neena Saini obtained written title to real property (the "Deed of Sale") in the village of Premghar, located in the Hoshiarpur district of the Punjab state in northern India (the "Property"). The Property covers an area of 8 "Marlas" (equal to approximately 2,180 square feet), and its purchase price was 24,000 Rupees, the equivalent of $1,331.85.[6] The Property was, and continues to be, a vacant, undeveloped lot. Despite holding record title to the Property, Neena Saini did not list any interest in the Property on her Bankruptcy Schedule A when she and her husband filed their Chapter 7 bankruptcy on October 30, 2012. While the Sainis later amended their Schedule A to list the Property, their initial failure to schedule the Property is one of the grounds upon which the Gillons seek to deny their Chapter 7 discharge.

Neena Saini's testimony regarding her ownership interest is inconsistent. First, Neena Saini believes that she never held more than a 50% interest in the Property, and that her mother, Surinder Saini, owned the other half interest. Saini points to the Deed of Sale to support this assertion. The Deed of Sale refers to Surinder Saini in the phrase "Other sellers now buyer Surinder Saini," and describes the 24,000 Rupees purchase price as "half of which is "Rs. 12000/- (Rupees Twelve

---

[6] On November 21, 1990, the conversion rate for Indian Rupees to U.S. Dollars was 18.02 Rupees per dollar.

13

Thousand only)".

Saini also testified that she fully transferred her interest in the Property to her brother through a power of attorney. On September 19, 2005, Neena Saini executed a document entitled "Power of Attorney-Special" (the "Power of Attorney") in favor of her brother, Rajesh Saini. While the Power of Attorney authorizes Rajesh Saini to undertake certain construction on the Property, it does not, on its face, transfer title. The Power of Attorney provides in part that:

> "I Neena Saini . . . hereby appoint Rajesh Saini, as my exclusive, true and lawful attorney-in-fact to act in my capacity, for me and in my name, to construct my home and in that certain real property at India, legally described as : D.C. Road near New Teshil Complex, Hoshairpur, Punjab, India."

The Power of Attorney also grants her brother "the power to hire and pay any architect, engineer, contract, electrical mechanical, sewage, water and utilities needed . . . [and] he will have power to make any amendment or change during construction." Finally, The Power of Attorney explicitly grants Rajesh Saini the power to "sell, exchange, convey, transfer, assign, encumber, hypothecate, or lease" the Property.

Notwithstanding the Power of Attorney, Saini also testified that she disclaimed ownership in the Property in 2008 in exchange for a $9,000.00 payment by her father. Neena Saini testified that these funds were both (a) a wedding gift for her daughter and (b) consideration for his purchase of her interest in the Property.

Finally, Saini argues that regardless of whether she had an interest in the Property in October 2012, the property was embroiled in litigation in India and therefore had little value. In 2010, Balbir Singh (who owned adjacent land) sued Saini's mother and father to enjoin them from building on the Property or encroaching on his easements rights. Neena Saini was not a party to the litigation. Despite this, Neen Saini filed an Indian police report in February 2011 stating that she owned the Property, and that Singh was illegally trespassing on it.

As stated above, the Sainis did not disclose the Property on their original Bankruptcy Schedule A. During their §341 meeting of creditors, the Gillons questioned the Sainis about the Property. Following the §341 meeting, the Gillons conducted a Rule 2004 examination of the Sainis on January 24, 2013. It was only after the meeting of creditors and the Rule 2004 examinations that

14

the Sainis filed an amended Schedule A on February 5, 2013. While the Sainis acknowledge that the Property is in Neena Saini's name in the amended Schedule A, they disclaim any beneficial ownership of the Property by stating that "Neena gave up rights to the property by executing a power of attorney in 2005." The amended schedule A also values her Property interest at zero (due the Singh litigation).

The Gillons allege that the Sainis' failure to list the Property in their original Schedule A constituted a "false oath" and warrants a denial of their Chapter 7 discharge under Bankruptcy Code §727(a)(4).

**The Bankruptcy Means Test and Bankruptcy Schedules.**

In December 2011, the Sainis' daughter ("Nidhi"), her husband, and their grandson moved into the Sainis' San Jose residence and lived with them past the Sainis' bankruptcy filing date. Neither Nidhi nor her husband were employed during this period, and the Sainis paid for part of their living expenses. Nidhi and her husband did, however, contribute approximately $500 per month to defray their living expenses. When the Sainis filed their Chapter 7 case, they disclosed the $500 monthly contribution as income on Schedule I and also classified Nidhi, their son-in-law, and grandson as their "Dependents."

The Sainis filed an Official Bankruptcy Form 22A (*i.e.* a Chapter 7 "Means Test") as part of their bankruptcy filing. On question 14 of Part III of the Means Test, the Sainis listed their "Household Size" at six. This included the Sainis, their minor daughter, Nidhi, their son-in-law, and their grandson. The Sainis treated the three members of Nidhi's family as "dependents" for purposes of the Means Test. Their total monthly income calculation on the Means Test did not, however, include the $500 contribution from Nidhi's family.

The Gillons allege that the Sainis' mischaracterization of Nidhi's family as their dependents constituted a "false oath," and warrants a denial of their Chapter 7 discharge pursuant to 11 U.S.C. §727(a)(4).

The Sainis also listed (a) $125 in charitable donations on their Schedule J and $150 in charitable donations on their Means Test, (b) $275 in monthly medical expenses on their Schedule J and the Means Test, and (c) $700 per month in transportation related expenses on Schedule J. The

15

Gillons allege that the Sainis intentionally inflated these expenses, and these representations also constitute "false oaths" under Bankruptcy Code § 727(a)(4).

**The Summary Judgment Order**

On May 2, 2014, the Gillons filed a motion for summary judgment on their §727(a)(4) claims for relief. On June 5, 2014, this court granted partial summary judgment under Fed. R. Civ. P. 56(g), on certain elements of the §727(a)(4) claims. The court determined that:

1. The Sainis misrepresented their household size on their Means Test;
2. Household size is a material fact in the underlying Chapter 7 case;
3. The Sainis knowingly mis-represented their household size, and knew it was false when they made the misrepresentation;
4. Neena Saini knew that she had an interest in the Property when she filed the underlying Chapter 7 case with her husband; and
5. Neena Saini knowingly failed to list the Property on her original Bankruptcy Schedule A.

Under Bankruptcy Code § 727(a)(4), this court may deny a Chapter 7 debtor's discharge if 1) the debtor made a false oath in connection with the case; 2) the oath related to a material fact; 3) this oath was made knowingly; and 4) the oath was made fraudulently.[7] The Gillons must establish these elements by a preponderance of the evidence. *In re Retz*, 606 F.3d 1189, 1197 (9th Cir. 2010) ( citing *Roberts v. Erhard (In re Roberts)*, 331 B.R. 876, 882 (9th Cir. B.A.P. 2005)); *In re Coombs*, 193 B.R. 557, 560 (Bankr. S.D. Cal. 1996) (citing *In re Bodenstein*, 168 B.R. 23, 27 (Bankr. E.D.N.Y.1994)).

A false oath may involve an affirmatively false statement or an omission from a debtor's bankruptcy schedules or statement of financial affairs. *In re Searles*, 317 B.R. 368, 377 (9th Cir. B.A.P. 2004) (citations omitted), *aff'd*, 212 Fed.Appx. 589 (9th Cir. 2006). A material fact is one that "bears a relationship to the debtor's business transactions or estate, or concerns the discovery of

---

[7] Bankruptcy Code § 727(a)(4)(A) provides in pertinent part that "The court shall grant the debtor a discharge unless . . . the debtor knowingly and fraudulently, in or in connection with the case –(A) made a false oath or account. . . ."

16

assets, business dealings, or the existence and disposition of the debtor's property." *In re Khalil*, 379 B.R. 163, 173 (9th Cir. B.A.P. 2007). Notwithstanding this broad definition, a "false statement or omission that has no impact on the bankruptcy case is not material and does not provide grounds for relief for denial of a discharge under § 727(a)(4). *Id*. at 172. An act is done "knowingly" when the debtor acts "deliberately or consciously." *Id.* at 173. Finally, an oath or omission is made fraudulently when the debtor makes a misrepresentation or an omission that at the time he or she knew was false with the intention and purpose of deceiving creditors. *Id*. Courts typically rely on circumstantial evidence to demonstrate this intent. *In re Devers*, 759 F.2d 751, 753-54 (9th Cir. 1985). Recklessness alone does not establish a debtor's fraudulent intent. It can, however, form a part of the circumstantial evidence typically used to establish fraudulent intent. *Khalil*, 379 B.R. at 173.

**The Property:** The Gillons did not meet their burden of proof under § 727(a)(4) regarding the Property. While the Sainis knew that Neena Saini owned the Property in October 2012 and therefore intentionally omitted it from their original Schedule A, the Gillons did not provide sufficient evidence that it had anything more than negligible value. While this court does not condone in any form or fashion the Sainis' decision to omit the Property on their original Schedule A, this court cannot lightly deny a Chapter 7 discharge. The Property was purchased in 1990 for slightly more than $1300, and the Gillons did not introduce competent evidence regarding the Property's 2012 value. Given the ongoing litigation (which for some unexplained reason did not name Neena Saini as a party, despite her being on record title) and its apparently small value, the Property was of no consequence to the bankruptcy estate. Accordingly, this § 727(a)(4) claim for relief is denied.

**The Means Test and Schedules:** The Summary Judgment Order establishes that the (a) the Sainis misrepresented their household size on the Means Test; (b) Household size is a material fact in the underlying Chapter 7 case; and (c) the Sainis knowingly mis-represented their household size, and knew it was false when they made the mis-representation. The question is whether they made this misrepresentation with the requisite intent to deceive.

Under 11 U.S.C. §707(b)(2), if a debtor's current monthly income, reduced by certain expenses or payments, is greater than certain threshold amounts set forth in the section, the Chapter 7

17

Case: 14-04151    Doc# 185    Filed: 01/29/15    Entered: 01/30/15 11:29:36    Page 17 of 20

petition is presumptively abusive, and the case must be converted to another chapter of the Bankruptcy Code or dismissed. 11 U.S.C. §707(b)(2). The Means Test, embodied in Official Bankruptcy Form 22(A), distills §707(b) into a form that must be completed (to varying degrees) in individual Chapter 7 cases. The Gillons argue that the Sainis improperly inflated their household size on their Means Test and avoided the need to convert or dismiss their Chapter 7 case.

The Gillons have not demonstrated by a preponderance of the evidence that the Sainis understood the consequences of increasing their household size on the Means Test. There is insufficient evidence that the Sainis possessed the legal acumen or received sufficient legal advice regarding its significance to find that they knowingly manipulated the Means Test. For example, the Sainis disclosed on their Bankruptcy Schedule I that their daughter was contributing $500 per month to their income. If a debtor were indeed clever enough to intentionally deceive creditors by misrepresenting the number of dependents in their household, they would not openly disclose information on their Schedule I that would throw doubt on whether the purported dependents actually qualified as such under the Means Test.[8]

The Gillons also failed to meet their burden of proof regarding their § 727(a)(4) allegations concerning the Means Test amounts of the Gillons' charitable donations and medical expenses, and their Schedule J monthly transportation expenses. The Gillons did not provide any persuasive evidence that the Sainis materially inflated these amounts. The Sainis' $150 Means Test charitable donation amount is consistent with the Sainis' 2012 tax return, which listed charitable contributions of $1240 (a monthly average of $103) and their testimony that this may not have included all of their regular Sunday church deposits into the "basket." Bhisham Saini also testified that he suffered from diabetes, hypertension, and high blood pressure, and that his insurance only covered 80% of his

---

[8] In fact, it is questionable whether the Debtors needed to complete the substantive portion of the Means Test. The Sainis' bankruptcy schedules and the evidence presented at trial indicate that most their liabilities may have been non-consumer debt related to PNS. It is quite possible that they were not required to complete the Means Test income and expense entries under § 707(b)(1). On July 8, 2014, the Sainis filed an amended Means Test that contained a declaration that their debts were not primarily consumer debts. This argument was first raised during the post-trial briefing. The court however, must make its determination on the evidence presented during trial.

Case: 14-04151    Doc# 185    Filed: 01/29/15    Entered: 01/30/15 11:29:36    Page 18 of 20

required medication and treatment costs after his deductible. It is quite possible that the uncovered portion of these monthly expenses could total $275, and the Gillons offered no evidence to the contrary. Finally, the Sainis testified that they spent $350 on gas commuting every month and, given the age of their three cars (a 1996 Toyota Corolla, 1994 Pontiac Sunbird, and a 2002 Mercedes-Benz), their future car maintenance costs could consume the remaining $350/month estimate. Again, it was the Gillons' burden to demonstrate the falsity of these estimates, and they failed to do so. The court therefore finds in favor of the Sainis on all of the § 727(a)(4) claims for relief.

## CONCLUSION

The Gillons shall submit a proposed judgment consistent with this court's memorandum decision.

**\* \* \* END OF MEMORANDUM DECISION \* \* \***

COURT SERVICE LIST

Parties are ECF participants